IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH TERRY and<br>JONAH ROSS TERRY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 09-0722-CG-N |
| | ) | |
| | ) | |
| GROVER SMITH and<br>BRUCE SHUE, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

This matter is before the court on defendants' motion for summary judgment (Doc. 112), plaintiffs' response in opposition (Doc. 120), and defendants' reply (Doc. 125). The court finds that defendants Grover Smith and Bruce Shue are entitled to qualified immunity. As such, defendants' motion for summary judgment is due to be granted.

## FACTS

In February 2007, the Escambia County Commission, at the request of the Poarch Band of Creek Indians, commenced action to vacate a portion of County Road 14. (Doc. 115-1) The Poarch Band of Creek Indians had agreed to construct

1

and maintain a new road and the proposed vacation was to be complete once the

new road was complete, was open to traffic and a right-of-way was deeded to the

County. (Doc. 115-1). The Poarch Band of Creek Indians owned the property north

of the road to be vacated and plaintiff, Joseph Terry, owned the property to the

south. The County Commission adopted a resolution on October 8, 2007, which

stated that the road:

> is due to be and shall be vacated at such time as the following
> contingencies are met and the County Engineer for Escambia County
> certifies to the Chairman of the County Commission that all terms and
> conditions that follow have been completed:
>
> 1. The newly constructed road (new CR14) will be constructed in such a
> manner as to comply with all minimum specifications that apply to the
> construction of county roads in Escambia County, Alabama.
>
> 2. The new CR 14 shall be dedicated to the County for designation as a
> county road and as a public thoroughfare.
>
> 3. The Tribal Council of the Poarch Band of Creek Indians shall agree,
> in writing, to maintain, at its expense, the new CR 14 in perpetuity to
> include, but not necessarily be limited to, upkeep, maintenance, repair,
> striping, resurfacing, reconstruction and landscaping.
>
> 4. On that portion of the new CR 14 that runs over and across tribal
> trust property and constituting approximately one hundred feet of
> roadway, the Tribal Council of the Poarch Band of Creek Indians and
> the Escambia County Commission shall work together to obtain
> appropriate approvals from the Bureau of Indian Affairs for a
> perpetual right-of-way. Any and all terms of any agreements entered
> into between Escambia County and the Poarch Band of Creek Indians
> dealing with the upkeep and maintenance of the new CR 14 shall be
> equally applicable to any portions of the roadway that lies on tribal
> trust property. In addition, a contract setting forth the rights and
> responsibilities of Escambia County and the Poarch Band of Creek

2

Indians dealing with issues relating to the new portion of County Road
14 shall be agreed upon, executed and filed with the appropriate
authority(s).

(Doc. 115-6, pp. 1-2).  The resolution further stated that upon the certification that

all contingencies had been met, the vacation was to be final without any further

action of the County Commission. (Doc. 115-6, p. 2).  The resolution was filed in the

Escambia County Probate Court on December 6, 2007 and on February 12, 2008.

(Doc. 121-1).[1]

After the Poarch Band of Creek Indians' casino opened in January 2008, the

Terrys and their attorney called the Sheriff's Department several times to complain

about trespassings onto their property. (Doc. 116-1, pp. 7-8).  People were driving

across the Terrys' yard, parking on their property, and walking everywhere trying

to get to the casino. (Doc. 116-1, p. 8).  The Sheriff's Department told them it was a

civil matter and there was nothing they could do. (Doc. 116-1, p. 7).

In January 2009, a lawsuit was filed in the Circuit Court of Escambia County

on behalf of the Estate of Jewel Terry, the record owner of Joseph Terry's property

at the time, against the Poarch Band of Creek Indians, Escambia County and the

Escambia County Commission. (Doc. 115-9).  The lawsuit alleged that the vacation

of the road should be declared void, that Terry Estate was the owner of a portion of

_____

[1] It is unclear why the resolution was filed twice, but it appears that the first filing
did not include the attachment "Exhibit 'A'" which contained a detailed description
of the property to be vacated.

3

the vacated road and that it was entitled to damages for trespass. (Doc. 115-9).  The

Circuit Court of Escambia County granted the motion of the Poarch Band of Creek

Indians to dismiss, finding that they were immune from suit. (Doc. 115-16, pp. 1-2).

The Court also granted summary judgment in favor of Escambia County and

Escambia County Commission finding that the 30-day statute of limitations set

forth in Alabama Code § 23-4-5 had expired. (Doc. 115-16, pp. 3-5).  In support of

their motion for summary judgment, the County submitted an affidavit detailing

procedurally what had been done with regard to the property. (Doc. 115-8).  The

affidavit explained that the Poarch Band had requested the vacation, that a public

hearing was scheduled and properly noticed, that a resolution vacating the property

was adopted at the hearing on October 8, 2007, and that notice of the resolution was

properly published.  The affidavit attached a copy of the resolution, which stated

the specific terms and conditions of the vacation.   The Escambia County defendants

took the position that the statute of limitations began to run on October 8, 2007, the

date the County Commission adopted the resolution vacating the road, while the

Terry Estate asserted that the statute of limitations had not run because the four

contingencies had not been met and the vacation was not final. (Doc. 115-16, pp. 3-

4).  The Escambia County Court found that although the contingencies had not been

met, the 30 day limitation contained in § 23-4-5 had run because the resolution

stated that "[n]o further action of the Escambia County Commission to effectuate

4

said vacation shall be required" and proper notice had been given of the vacation. (Doc. 115, pp. 4-5). The Terry Estate appealed, but voluntarily dismissed the appeal in October 2009. (Doc. 115-18, Doc. 115-19).

By letter dated September 30, 2009 to counsel for the Poarch Band of Creek Indians, counsel for the Terrys[2] stated that the Poarch Band of Creek Indians had encroached on the Terrys' property. (Doc. 115-21). The letter demanded the removal of all encroachments, which allegedly included a water meter box and water valve box, 20 feet of concrete curb and asphalt, two electrical boxes, a grate inlet, a light pole, a 30-foot retaining wall, 90 to 100 feet of the casino building, and trash. (Doc. 115-21, p. 2). The letter demanded that the encroachments be removed within 72 hours. (Doc. 115-21, p. 3). The letter also stated that it was being copied to the Escambia County Sheriff's Department (among others) and that if the Sheriff's Office was not willing to cooperate in any efforts to keep the property of the Poarch Band of Creek Indians and other trash off of the Terrys' property, they "will resort to self-help." (Doc. 114-21, p. 3).

The Terrys' counsel sent a second letter to counsel for the Poarch Band of Creek Indians dated October 1, 2009 stating the following:

> Please notify your clients to make whatever arrangements they need to for the physical safety of the casino guests and their personalty

---

[2] Counsel that authored this letter and the subsequent letter is not current counsel for the Terrys.

5

during the process of removal of your client's property from the realty
owned by the Terry's as described in my letter earlier to you this week.
We will be commencing removal of those items in the next few days
and we really do not want any innocent parties to become a part of
this.

We will not be responsible for your failure to advise any of your
guests of the risks of loss of property or injury to their persons should
you fail to make appropriate arrangements for their safety.

Thank you for your kind attention to this manner.

(Doc. 115-22). The letter indicated that it was copied to Mr. and Mrs. Joseph Terry
and to the Escambia County Sherriff's Department.

On or about October 2, 2009, Mr. Terry's counsel called the Sheriff's
Department about the repeated trespassing on the Terrys' property. (Doc. 116-1, p.
7). Deputy Shue came out to the Terrys' property and after talking with Joseph
Terry for a minute, told him that it was a civil matter and there was nothing he
could do. (Doc. 116-1, p. 7).

On October 7, 2009, the Sheriff, defendant Grover Smith received a call that
Joseph Terry was down near the casino digging up asphalt with a trackhoe and was
moving towards the casino. (Doc. 116-3, p. 12; Doc. 117-3, p. 8). Sheriff Smith was
afraid he was going to do what his letters had threatened and knock down the
buildings. (Doc. 116-3, pp. 12-13). While en route to the scene, Smith called the
county attorney, Thad Moore, and asked if Old County 14 was still in the County
inventory or if it had been vacated and Mr. Moore responded that it still belonged to
the County. (Doc. 116-3, p. 15; Doc. 118-1, pp. 19-20). Sheriff Smith then called the

6

District Attorney, Steve Billy, apprised him of the situation and told Mr. Billy that based on the letters he did not think Mr. Terry would be willing to reconcile and move the trackhoe. (Doc. 116-3, p. 41).  Sheriff Smith told Billy that if he arrests Mr. Terry he would probably charge him with trespass in the third degree and Billy concurred that that would be the best charge. (Doc. 116-3, p. 41; Doc. 117-2, p. 20).

Sheriff Smith reports that he went to the scene to preserve the peace. (Doc. 116-3, p. 22).  Smith did not think Joseph Terry would harm anyone, but he said he could not take that chance. (Doc. 116-3, p. 16).  Smith stated the following:

> He's not a cruel, vindictive man.  As far as I know, he has never been arrested in his life.  But I do believe that he got very bad legal advice. I think he was told things that are just simply not so.  Like I have said, I have never read letters from an attorney with that tone and, frankly, it frightened me and I didn't know what he had convinced Mr. Terry he could and could not do.

(Doc. 116-3, p. 16).

When the Sheriff and Deputy Shue arrived, Mr. Terry was digging up asphalt from the County Road 14 roadbed with a trackhoe. (Doc. 117-1, p. 14).   The trackhoe could not have touched the casino building from where it sat at that time. (Doc. 117-3, p. 13).  It was facing away from the casino, but was traveling towards the casino and the Sheriff was concerned that the situation was about to become dangerous. ((Doc. 116-3, pp. 23, 38).  Sheriff Smith asked Mr. Terry to shut off the trackhoe, which he did. (Doc. 117-1, p. 16).  The Sheriff then asked Joseph Terry to move the trackhoe from the property, back to his own property. (Doc. 117-1, pp. 16-

7

17).   Mr. Terry responded that he should tell it to his lawyer. (Doc. 117-1, p. 17).

Sheriff Smith told Mr. Terry he had to either remove the trackhoe from the property

or he was going to go to jail. (Doc. 117-1, p. 19).   Mr. Terry just sat there and said

"I'll just go to jail" or "Take me to jail" and the Sheriff told him he was under arrest.

(Doc. 117-1, p. 19; Doc. 117-3, p. 17).   Mr. Terry was then placed under arrest and

charged with criminal trespass third degree, which is a misdemeanor. (Doc. 116-3,

p. 24).

The Sheriff and another deputy, Deputy Lambert had told everyone to get off

the road and back on their own property. (Doc. 117-3, p. 33).   Joseph Terry's son,

Ross Terry, started to come over, but was told by Lambert to stop. (Doc. 116-2, p.

10).   Ross Terry walked away but then turned back around and came back onto the

right-of-way of County Road 14. (Doc. 117-3, p.31-32, 34; Doc. 116-2, p. 10).   Ross

Terry walked up to Deputy Lambert and said "you're going to have to take me too."

(Doc. 117-3, pp. 34-35, 36-37; Doc. 116-2, p. 10).   Ross Terry was shaking at the time

because he was mad, but he does not think he ever raised his voice. (Doc. 116-2, p.

11).   Ross Terry was then also placed under arrest for criminal trespass third

degree.   The Sheriff reports that he placed Ross Terry under arrest because "I knew

there was going to be trouble if didn't because he was refusing to obey a lawful

order to get off the property." (Doc. 116-3, p. 33).

Joseph and Ross Terry were subsequently indicted by a Grand Jury and charged with criminal mischief first degree, criminal trespass third degree, obstructing governmental operations and failure to obey a police officer. (Doc. 117-2, p. 37). Mr. Billy recused himself from prosecuting the charges because he was sued by the Terrys. (Doc. 117-2, pp. 46-47). The District Attorney for Conecuh and Monroe Counties who was appointed to handle the charges later dismissed all charges against the Terrys.

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc.,

284 F.3d 1237, 1243 (11th Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>See</u> <u>Anderson</u>, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir. 1994)(citing <u>Celotex</u>

Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B.  Plaintiffs' Claims

The only claims remaining in this case are plaintiffs' § 1983 claims against Sheriff Smith and Deputy Shue. (See Doc. 88).  The complaint asserts that on or about October 7, 2009, Smith and Shue "did under color of state law deprive the Plaintiffs of

their liberty and right and use of their property guaranteed to them under Amendments IV and V of the United States Constitution." (Doc. 18, p. 5).

The complaint does not state whether the action is brought against these defendants in their official or individual capacities. A county sheriff and his deputies cannot be held liable in damages, in their official capacities, for their own acts or those of their employees because they enjoy Eleventh Amendment immunity. See Weaver v. Mobile County, 228 Fed.Appx. 883, 886 n. 8 (11th Cir. 2007).; see also Carr v. City of Florence, Alabama, 916 F.2d 1521 (11th Cir. 1990) (holding that the Eleventh Amendment immunity extends to deputy sheriffs because of their "traditional function under Alabama law as the sheriff's alter ego."). In addition, the Sheriff (when sued for damages in his official capacity) is not a "person" for purposes of § 1983 relief. Will v. Mich. Dep't of State, 491 U.S. 58 (1989). Thus, to the extent they are sued in their official capacities, the defendants are absolutely immune from liability in this action.

To the extent plaintiffs claims are brought against Smith and Shue in their individual capacities, the officers assert they are entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose of this immunity is to allow

12

government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). The actions are discretionary if "they are of a type that fell within the employee's job responsibilities." Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  In assessing whether an official was engaged in a discretionary function, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id.  Here, it is clear that Smith and Shue were acting within the course and scope of their discretionary authority in responding to a call to the Sheriff's Department, travelling to the scene for the purpose of preserving the peace and ultimately arresting the plaintiffs.  In fact, plaintiffs do not dispute that the defendants were performing a discretionary function when they made the arrests. (Doc. 120, p. 11).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not

13

appropriate." Lee, 284 F.3d at 1194.  An analysis of whether qualified immunity is appropriate must begin with the threshold determination of whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violates a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002).  If no constitutional right was violated, the court need not inquire further. Id.  If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.  For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515 (2002).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted).

In Fourth Amendment terminology, an arrest is a seizure of the person, California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and the "reasonableness" of an arrest is determined by the presence or absence of probable cause for the arrest.  "There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997) (citing Von Stein v.

14

Brescher, 904 F.2d 572, 579 (11th Cir. 1990)).   "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted).

"While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).  An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause.  As the Supreme Court observed in Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." Thus, even if it is determined that the officers did not in fact have probable cause, the standard to be applied is that of "[a]rguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest."  Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting Scarbrough v. Myles, 245 F.3d

15

1299, 1302 (11th Cir. 2001)).  This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists.   The plaintiffs bear the burden to "demonstrate that no reasonable officer could have found probable cause under the totality of the circumstances." Id.  Thus, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Holmes, 321 F.3d at 1079 (internal quotations marks and citations omitted).

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. Skop, 485 F.3d at 1137–38. Arguable probable cause does not, however, require an arresting officer to prove every element of a crime before making an arrest, because such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001).  Thus, the inquiry is "whether [the defendant] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime." Id. at 1303 n. 8.

In the instant case, Sheriff Smith and Deputy Shue arrested Joseph and Ross Terry for criminal trespass third degree.

> A person is guilty of criminal trespass in the third degree when he
> knowingly enters or remains unlawfully in or upon premises.

ALA. CODE § 13A-7-4.  "Premises" is defined to include any building and any real

property. ALA. CODE § 13A-7-1(1).  The phrase "enter or remain unlawfully" is defined

as follows:

> A person "enters or remains unlawfully" in or upon premises when he is
> not licensed, invited or privileged to do so. A person who, regardless of his
> intent, enters or remains in or upon premises which are at the time open
> to the public does so with license and privilege unless he defies a lawful
> order not to enter or remain, personally communicated to him by the
> owner of such premises or other authorized person. A license or privilege
> to enter or remain in a building which is partly open to the public is not a
> license or privilege to enter or remain in that part of the building which
> is not open to the public. A person who enters or remains upon
> unimproved and apparently unused land, which is neither fenced nor
> otherwise enclosed in a manner designed to exclude intruders, does so
> with license and privileges unless notice against trespass is personally
> communicated to him by the owner of such land or other authorized
> person, or unless such notice is given by posting in a conspicuous
> manner.

ALA. CODE § 13A-7-1(4).

At the time of their arrest, both Joseph and Ross Terry were on real property

that, at least according to the information provided by the county attorney, Thad

Moore, and the District Attorney, Steve Billy, belonged to the County.   Under the

terms of the October 8, 2007 resolution, the property was to be vacated, but that

vacation would not be final until the County Engineer certified to the Chairman of the

County Commission that all of the stated terms and conditions had been completed.

At the time of their arrest, the county engineer had not certified that the terms and

17

conditions were complete. Thus, according to the terms of the resolution, the vacation was not yet final and Joseph and Terry Ross remained on public real estate despite being ordered to leave the property. Upon being told they must get off the property or be arrested, both Joseph and Ross Terry responded that the officers should take them to jail. Thus, both Joseph and Ross Terry appear to be guilty of trespass third degree because they defied lawful orders to leave the property.

Plaintiffs argue that defendants should be estopped from arguing that the property was not vacated at the time of the arrest because in the Escambia County lawsuit, the Escambia County defendants took the position that the property had been vacated. In that lawsuit, the court granted summary judgment in favor of the County because the 30-day statute of limitations had run. The affidavit in support of the County's motion for summary judgment attached a copy of the resolution and stated that the resolution vacating the property was adopted on October 8, 2007. The affidavit did not state that the property had been vacated or was final and did not contend that the terms and conditions stated in the resolution had been met. Accordingly, defendants' stance in the instant case, that they understood the property to be County property at the time of the arrest, does not conflict with the affidavit's statement that a resolution vacating the property had been adopted on October 8, 2007.

18

The Escambia court's summary judgment order specifically noted that the required conditions for vacation had not been met.  The statute of limitations that barred the Terrys' claims in the Escambia lawsuit began to run not at the time the vacation became effective, but at the time the "decision" was made to vacate the property.  Section 23-4-5 requires that:

> Any party affected by the vacation of a street, alley or highway pursuant to this chapter may appeal within thirty (30) days of the <u>decision</u> of the governing body vacating this street to the Circuit Court of the county in which the lands are situated …

Ala. Code § 23-4-5 (emphasis added).  The "decision" was made on October 8, 2007; the date the County Commission adopted the resolution vacating the road, regardless of when the vacation was finalized.  Thus, the court finds that neither the position taken by the County in the Escambia County lawsuit; nor the Escambia court's decision that the statute of limitations began to run on October 8, 2007, are in conflict with the defendants' current position in this case.

Plaintiffs also contend that the vacation was final because it had been filed with the Escambia County Probate Court prior to their arrest.  Plaintiffs point to Alabama Code § 23-4-2 which provides the following:

> The filing of the resolution as required herein shall operate as a declaration of the governing body's vacation and shall divest all public rights and liabilities, including any rights which may have been acquired by prescription, in that part of the public street, alley, or highway vacated. Title and all public rights, including the right to close the street, alley, or highway vacated, shall vest in the abutting landowners.

19

ALA. CODE § 23-4-2 (b).  The court is aware of no case law that construes the above language where the filed resolution expressly states that the property shall be vacated only upon certain contingencies being met.  The court does not read the statute as mandating that a conditional vacation becomes immediately final upon filing.  The statute states that the resolution shall operate as a "declaration" of the vacation. "Declaration" is defined by Black's Law Dictionary as "[a] formal statement, proclamation, or announcement" or "[a] document that governs legal rights to certain types of real property, such as a condominium or a residential subdivision."  Black's Law Dictionary 415 (7th ed. 1999).  Thus, the resolution is the governing statement regarding the vacation.  The resolution clearly states that the vacation will occur "at such time" as certain stated contingencies are met and that the vacation will be final upon those conditions having been met.  The statute states that the filing of a resolution vacating property shall divest all public rights and liabilities, but does not specifically state that the rights and liabilities shall be divested immediately upon the filing.  Moreover, the resolution is not simply a resolution vacating the property, but is a resolution that the property would be vacated at some date in the future if the contingencies are met.  It has been referred to as a resolution vacating the property because that is its ultimate purpose and is what it ultimately does if the contingencies are met.  If the resolution had simply stated that the property was vacated then the filing would have divested the County of its rights at that time, but the resolution did

20

not vacate the property until certain contingencies were met. A reasonable reading of the statute would be that the filing of a resolution that states that a piece of property would be vacated at some date in the future will divest the County of its rights at the stated time.

If the Poarch Band of Creek Indians refused to construct the new road, there would be little question that the property had not been vacated even if the resolution had been properly noticed and filed. The problem seems to be that most, but not all of the contingencies had been met and the Poarch Band of Creek Indians had treated the property as if the half on their side already belonged to them. However, the claims before this court have nothing to do with whether the Poarch Band's actions were appropriate. The court understands how plaintiffs might believe they were treated differently than the Poarch Band of Creek Indians. However, if plaintiffs' counsel had not sent letters threatening to tear up part of the casino and stating that plaintiffs would not be responsible for their failure to advise guests of the risks of loss of property or injury to their persons, then the Sheriff and his deputies would have likely let Mr. Terry continue digging up the road until and unless plaintiffs gave them other reasons to be concerned for the safety and welfare of others. It is clear that the officers were not really concerned about the road itself, for the intention was always to vacate the road and allow both the Terrys' and the Poarch Band to each use half of the property. The officers were concerned for the safety of not only casino property and

guests, but also for the people who had arrived at the scene.  To control the situation and ensure that it did not dissolve into something more dangerous, the officers told everyone to stay off or move off the property, including representatives of the Poarch Band of Creek Indians who were at the scene.  Only Joseph and Ross Terry refused to comply.

Plaintiffs make much of the fact that the Sheriff was prepared to charge Joseph Terry with trespassing before he even arrived at the scene.  However, the Sheriff was merely preparing for the worst given the facts, as he understood them before he arrived at the scene.  Since the Sheriff was unsure about the legal status of the property, he inquired about its status from persons more knowledgeable than him about the matter.  Once at the scene, Joseph Terry was in place with a potentially dangerous piece of equipment that could accomplish exactly what had been threatened in the letters.  Plaintiffs also make much of the fact that Mr. Terry was only tearing up the road that had been or was to be vacated and that the trackhoe was facing away from the casino. Although the trackhoe was facing away from the casino, it was traveling towards the casino.  Even though the trackhoe was not within immediate striking range of the casino, Mr. Terry was capable of doing damage to the casino and guests within a short period of time.

The Sheriff placed plaintiffs under arrest because they were refusing to obey a lawful order to get off the property and he thought there would be trouble if he did not

arrest them.  The facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, lead Sheriff Smith and Deputy Shue to believe an offense had been or was being committed.  The officers did not know if Joseph Terry would follow through with the threats made in the letters, but when he was ordered to move his backhoe off of the property and refused to comply, the court finds it was reasonable for the Sheriff to believe an offense had been committed.  Likewise, the court finds that it was reasonable for the officers to believe that a crime was being committed when Ross Terry refused to obey their orders to leave the property.  Even if the officers were wrong in their understanding that the property belonged to the County, that fact was not so clearly established to negate arguable probable cause.  Plaintiffs have not shown that their right to remain on the property was clearly established.  Under the terms of the resolution the vacation was not final and plaintiffs have pointed to no prior case law holding that the filing of a resolution immediately divests the governing body of it rights to the property when the resolution states that the vacation is contingent upon certain terms and conditions and those terms and conditions have not yet been met.  Reasonable officers in the same circumstances and possessing the same knowledge as the defendants could have believed that probable cause existed to arrest. Accordingly, Smith and Shue are entitled to qualified immunity and summary judgment is due to be granted in their favor.

23

## CONCLUSION

For the reasons stated above, the motion of defendants Grover Smith and Bruce

Shue for summary judgment (Doc. 112), is **GRANTED.**

**DONE and ORDERED** this 6th day of August, 2012.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE

24